UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL ACTION NO. 14-10367-RGS

UNITED STATES OF AMERICA

v.

RAFAEL ROJAS-CAMILO

CONSOLIDATED MEMORANDUM AND ORDER ON
DEFENDANT'S MOTIONS TO SUPPRESS

March 17, 2016

STEARNS, D.J.

The indictment underlying this case charges defendant Rojas-Camilo with conspiracy to distribute heroin and money laundering.[1] At issue are two motions to suppress. The first challenges a search warrant directed at Rojas-Camilo's place of business, Hidalgo Multiservice Store (HMS), in Lawrence, Massachusetts. In essence, the motion attacks the warrant for an alleged want of particularity owing to the failure of the affiant to serve an exhibit to the warrant specifying the property to be seized. The second motion attacks a Title III electronic interception warrant for misstating the viability of

---

[1] Rojas-Camilo is alleged to have belonged to a multi-kilogram heroin distribution ring that purchased heroin from Mexican suppliers to whom it remitted large sums of cash. Rojas-Camilo is said to have used his business as a front for the laundering of drug proceeds and the transfer of illicit cash receipts.

alternative non-electronic methods of investigation. For the reasons that follow, the motions will be denied.

*The Premises Warrant*

The warrant directed to the premises of HMS was supported by an affidavit attested by DEA Task Force Detective Matthew Woodman on December 17, 2014. The warrant incorporated an Attachment B that described the specific property to be seized. Rojas-Camilo complains that following the execution of the warrant (on December 22, 2014), the attending officers served only the warrant (shorn of Attachment B) and a receipt listing the actual property taken. While acknowledging that a court may, in testing the particularity requirement, construe the warrant together with any appropriately incorporated exhibits, defendant faults the executing officers for failing to satisfy "the second requirement" of *Groh v. Ramirez*, 540 U.S. 551 (2004), "that the supporting document be present during the search and [be] served with the warrant." Def.'s Mem., Dkt #182 at 6. Rojas-Camilo makes a further argument that the executing officers exceeded the scope of Attachment B by seizing two flash drives from the premises of HMS despite that, in issuing the warrant, Magistrate Judge Hennessey had specifically crossed out the paragraph (No. 11) authorizing the seizure of "thumb drives . . . and other memory storage devices."[2]

---

[2] Rojas-Camilo makes a second more general argument that the warrant was overbroad by reason of its authorization to seize all documents "evidencing narcotics possession, use, or trafficking" (specifying methamphetamine as a particular example), as well as records relating to the "concealment and/or expenditure of money relating to the distribution of

Officers executing a search are required to have the warrant and any incorporated guidance as to the place to be searched and the items to be seized in their possession at the time of the search.  The warrant not only insures that the officers remain within the parameters of what the court has defined their searching authority to include, but it also alerts the occupant of the premises being searched to the fact that the police are acting lawfully and with the requisite judicial permission.  *Groh*, 540 U.S. at 561-562.  In *Groh*, the case on which Rojas-Camilo relies, the warrant on its face described only the place to be searched and failed to incorporate by reference the application describing the property to be seized.  *Id.* at 554-555.  In this regard, the Court noted that "most Courts of Appeal have held that a court may construe a warrant with reference to a supporting application or affidavit if the warrant

---

controlled substances."  The controlling law in this regard recognizes a crucial distinction between a prohibited general warrant that authorizes indiscriminate seizures and a lawful warrant that demonstrates probable cause linking a class of generic items to a specific crime.  *Compare United States v. Abrams*, 615 F.2d 541, 544 (1st Cir. 1980) (invalid warrant directing the omnibus seizure of "Medicare and Medicaid records" in a doctor's office) *and United States v. Guarino*, 729 F.2d 864, 866 (1st Cir. 1984) (*en banc*) ("all" obscene matter on the premises) *with United States v. Bithoney*, 631 F.2d 1, 2 (1st Cir. 1980) (documents limited to proof of a defined conspiracy) *and United States v. Dennis*, 625 F.2d 782, 792 (8th Cir. 1980) (documents related to specific loan-sharking transactions) *and United States v. Frederickson,* 846 F.2d 517, 520 (8th Cir. 1988) (documents related to crimes specifically described in an attached affidavit).  In this case, Attachment B delineates and describes the specific statutory violations of which were the target of the search.  (The reference to methamphetamine appears to be a scrivener's error, but the warrant itself is not limited to any specific controlled substance.)

uses appropriate words of incorporation, and if the supporting document accompanies the warrant." *Id.* at 557-558.

Contrary to defendant's reading of the case, however, the Court in *Groh* did not lay down a constitutional rule that the occupant of the premises being searched must be served with a copy of the warrant before the search is executed. (*Groh* involved a *Bivens* action and not a motion to suppress evidence). As the authoritative Professor LaFave explains, the Court said quite the opposite, *see* 540 U.S. at 562 n.5 ("Quite obviously, in some circumstances . . . it will be impracticable or imprudent for the officers to show the warrant in advance."). And this, as Professor LaFave continues, "is the sum total of the discussion of the issue . . . [of the] right of the person at the search scene to learn about the warrant's limitations." LaFave, 2 *Search and Seizure* § 4.12(a) (5th ed. 2012). As the Court later clarified, "[t]he Constitution protects property owners not by giving them license to engage the police in a debate over the basis for the warrant, but by interposing, *ex ante*, the 'deliberate, impartial judgment of a judicial officer . . . between the citizen and the police,' . . . and by providing, *ex post*, a right to suppress evidence improperly obtained and a cause of action for damages." *United States v. Grubbs*, 547 U.S. 90, 99 (2006). In other words, service of the warrant is not a constitutional requirement, but a matter of rules practice. *See* Federal Rule of Criminal Procedure 41(f)(1)(C), ("The officer executing the warrant must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was

4

taken or leave as copy of the warrant and receipt at the place where the officer took the property."). The executing officers here, by defendant's own admission, complied with the formalities of Rule 41 by leaving behind a copy of the warrant and a property receipt, although it is undisputed that the warrant did not include Attachment B. The omission, if it was one, would not (as Professor LaFave notes) require or justify the application of the exclusionary rule.[3] *See* 2 LaFave, *supra*, § 4.12(a), citing *United States v. Hector*, 474 F.3d 1150 (9th Cir. 2007), and *Hudson v. Michigan*, 547 U.S. 586 (2006).

Finally, while the seizure of the flash drives exceeded the scope of the warrant (the government does not disagree), where portions of a warrant are invalid for lack of probable cause or particularity, "the infirmity of part of a warrant requires the suppression of evidence seized pursuant to that part of the warrant . . . but does not require the suppression of anything described in the valid portions of the warrant (or lawfully seized — on plain view grounds, for example — during their execution)." *United States v. Fitzgerald*, 724 F.2d 633, 637 (8th Cir. 1983) (*en banc*). The First Circuit is firmly within the partial suppression camp. *See United States v. Gianetta*,

---

[3] Rule 41 says nothing about attachments to the warrant nor is it clear that leaving an incorporated application or exhibits in addition to the warrant itself is necessary to serve the ultimate purpose of assuring the owner of the premises or the property that police are acting pursuant to judicial authorization. The warrant (as was the case here) directs the property owner to the court where the warrant issued and where the return of the warrant is filed with its supporting document, while the receipt confirms the actual seizures of property that occurred.

909 F.2d 571, 580 n.7 (1st Cir. 1990) ("The general rule in this circuit requires suppression of only the evidence seized without probable cause [or here, proper authorization], while allowing use of the rest.").

*The Title III Warrants*

The second of Rojas-Camilo's motion is directed to related Title III warrants issued by Judge Young, the first on May 8, 2014, and, in iterations eventually involving 6 target telephones, the last of which issued on November 26, 2014. The motion contends that the affidavit sworn by Detective Woodman in the two instances directly relevant to Rojas-Camilo (Telephone #2, July 29, 2014, and Telephone #6, November 26, 2014) contained intentional or reckless misrepresentations and omissions of material fact warranting a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978).[4]

While a judicial ruling on a motion to suppress is ordinarily confined to the "four corners" of the affidavit, there are circumstances in which a defendant may challenge the truthfulness of statements made by the affiant in a so-called *Franks* hearing. *Cf. United States v. Southard*, 700 F.2d 1, 7 (1st Cir. 1983) (a facially sufficient affidavit is entitled to a presumption of validity). To be entitled to a hearing under *Franks*, a defendant must make "a substantial preliminary showing" that an affidavit contains intentionally

---

[4] I do not read the motion to suggest that the warrant affidavit on its face fails to establish probable cause for the issuance of the Title III warrant. The argument is rather that the affidavit, if shorn of reckless or deliberately false statements (or cured of omissions), is vulnerable to attack.

false or recklessly untrue statements that are material to a finding of probable cause. *Franks*, 438 U.S. at 155-156, 170.

> [T]he challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons.

*Id.* at 171.

If a hearing is warranted, the defendant must prove the knowing falsity or recklessness of the affiant's statements by a preponderance of the evidence. *Id.* at 156. The defendant must also show that any deliberately false or reckless statement was material to the determination of probable cause. If such a showing is made the offending statement is excised from the affidavit, which is then reexamined for probable cause. *Id.* at 171-172; *United States v. Veillette*, 778 F.2d 899, 903-904 (1st Cir. 1985).

The reckless or deliberate omission of material information from an affidavit also raises a *Franks* issue. *United States v. Rumney,* 867 F.2d 714, 720 (1st Cir. 1989). As is the case with deliberate or reckless inclusions, a reviewing court should add any facts intentionally or recklessly omitted from the affidavit and determine whether the new information would have defeated the finding of probable cause. *United States v. Cole*, 807 F.2d 262, 267-268 (1st Cir. 1986).

In attacking the two relevant Woodman affidavit(s) submitted to Judge Young, Rojas-Camillo directs his fire at Woodman's assessment that alternative investigation procedures had been less than fruitful and were unlikely to achieve the ultimate goal of unmasking the conspiracy.[5] With respect to the authorization to tap Telephone #2 (July 29, 2014), Rojas-Camilo contends that Woodman underplayed the utility of a pole camera that police had surreptitiously installed in front of the conspirators' suspected stash house at 115 Market Street in Lawrence. Rojas-Camilo labels as deliberately false Woodman's statement that the pole camera had failed to capture Daniel Perez-Delarosa, the suspected leader of the conspiracy, when in fact Perez-Delarosa had been caught by the camera entering the house the day before the affidavit was sworn. Rojas-Camilo further argues that Woodman deliberately minimized the role that cellular phone tracking had played in the days leading up to the interception of Perez-Delarosa as he attempted to transport illicit cash by car to New Jersey. With respect to Telephone #6 (November 26, 2014), Rojas-Camilo alleges that Woodman failed to sufficiently credit the role that physical surveillance and a conventional search warrant had played in intercepting Jaime Corletto, a Mexican drug courier in possession of a large shipment of cash. He also

---

[5] The premise of Title III is that electronic surveillance should be a last, or at least a later, resort taken out of necessity, and not the first investigative technique deployed. *See* 18 U.S.C. § 2518(1)(c); *United States v. Hoffman*, 832 F.2d 1299, 1306-1307 (1st Cir. 1987).

alleges that Woodman failed to fully convey to Judge Young the importance of the information that Corletto had subsequently agreed to provide to police.

Turning first to the July 29 affidavit, like the government, I am at a loss as to how the failure to report that Perez-Delarosa had been captured by the pole camera entering the Market Street "stash" house adds or detracts from the probable cause to tap Telephone #2. Nor do I find anything objectionable or misleading about Woodman's explanation of the limitations of pole camera surveillance, more specifically the inherent visual restrictions caused by the camera's fixed orientation and inability to gather aural information. The same is true of the explanation of the investigatory limitations of cellular telephone tracking. While such tracking was able to identify with reasonable accuracy Perez-Delarosa's location as he traveled on the Interstate, it revealed nothing about the nature or origin of the cash in his possession or the purpose or ultimate destination of the trip that he and Nackely Hernandez took on June 13, 2014.[6]

With respect to the November 26 affidavit, Rojas-Camilo objects to Woodman's alleged failure to delve more deeply into the potential usefulness of Corletto as a cooperating witness. In his affidavit, Woodman disclosed that the October 27, 2014 search of Corletto's car, the recovery of $98,000 in cash, and the subsequent seizure pursuant to a warrant of an additional

---

[6] Rojas-Camilo's suggestion that the Task Force officers knew the purpose of Perez-Delarosa's travel on this occasion because of past surveillance of a similar trip is conjectural, and as the government fairly points out, in some aspects nonsensical. See Dkt #238 at 13.

$450,000 from a safe in Corletto's hotel bedroom. He further revealed Corletto's tentative offer to cooperate and Corletto's admission that he was a drug-money launderer. Finally, he disclosed that Corletto had not been arrested at the request of DEA agents in California who feared that an arrest would compromise an unrelated investigation of their own. Rojas-Camilo's complaint is not that Woodman failed to air the subject of Corletto, but that he should have more fulsomely described the potential value of Corletto's cooperation to a successful government prosecution.

The government's answer, which is borne out by the successive wiretap applications, is that most of the factual omissions that Rojas-Camilo recites (notably, those involving the prior surveillance of a meeting between Nackely Hernandez and Corletto) are incorporated in the November 26 application by reference. There is no requirement that an affiant who is seeking to expand an existing Title III warrant iterate historical facts that have been previously presented to the court. *See United States v. Yeje-Cabrera*, 430 F.3d 1, 8-9 (1st Cir. 2005). Moreover, it would have been apparent to the court that Corletto, while he might have had much to say about the money laundering practices of the Sinaloa cartel, was not a member of Perez-Delarosa's organization, and thus an unpromising recruit as the mainstay of a prosecutable case.[7]

---

[7] Moreover, as Woodman acknowledged, the DEA had lost contact with Corletto after releasing him and had no knowledge of his whereabouts at the time the November 29 affidavit was submitted.

Rojas-Camilo's final argument is that Woodman failed to inform Magistrate Judge Hennessy prior to the issuance of the warrant to search HMS that Judge Young had struck "Chavelo" (Rojas-Camilo's nickname) as a Title III target in the September 29 and October 30 Orders, and that this omission requires a *Franks* hearing.[8]  The argument is a nonstarter for one essential reason.  As the government rightly notes, the warrant issued by Magistrate Judge Hennessy was directed to the search of the premises of HMS for evidence of drug trafficking and money laundering and not the interception of "Chavelo's" telephone conversations.[9]

### ORDER

For the foregoing reasons, the motions to suppress are <u>DENIED</u> (with the exception of the two thumb drives).  The motion for a *Franks* hearing is also <u>DENIED</u>.

SO ORDERED.

/s/ Richard G. Stearns

_____
UNITED STATES DISTRICT JUDGE

---

[8] The identity of "Chavelo" as Rojas-Camilo had not then been confirmed.

[9] While the affidavit presented to the Magistrate Judge recited several incriminating telephone conversations to which Rojas-Camilo was a party, these conversations were with Perez-Delarosa whose conversations on the target telephones Judge Young had authorized for interception.  Thus, the addition of the fact that Judge Young had not authorized "Chavelo" as a named target would have had no bearing on the issue of probable cause.